# In the United States Court of Appeals for the D.C. Circuit

PALM BEACH COUNTY, a political division of the State of Florida,
TOWN OF PALM BEACH, a municipal corporation of the State of Florida, and
CITY OF WEST PALM BEACH, a municipal corporation of the State of Florida,

*Petitioners,*

*v.*

FEDERAL AVIATION ADMINISTRATION,

*Respondent.*

On Petitions for Review of Orders of the
Federal Aviation Administration

**PETITIONERS' ADDENDUM TO OPENING BRIEF**

Steven L. Osit
sosit@kaplankirsch.com
Samantha R. Caravello
scaravello@kaplankirsch.com
Rebecca Glenn
rglenn@kaplankirsch.com
Kaplan Kirsch LLP
1634 I (Eye) Street NW, Suite 300
Washington, D.C. 20036
202.955.5600

*Counsel for Palm Beach County*

Jeffrey L. Oldham
joldham@jw.com
Jackson Walker LLP
100 Congress Ave.,
Suite 1100
Austin, Texas 78701
512.236.2000

Justin V. Lee
jlee@jw.com
Cody A. Martinez
cmartinez@jw.com
Jackson Walker LLP
2323 Ross Ave.,
Suite 600
Dallas, Texas 75201
214.953.6000

*Counsel for Town of Palm Beach, Florida and
City of West Palm Beach, Florida*

# ADDENDUM TABLE OF CONTENTS

<u>Statutes</u>

5 U.S.C. § 553 ................................................................................... 1

42 U.S.C. § 4336 ............................................................................... 3

42 U.S.C. § 4336e ............................................................................. 5

49 U.S.C. § 303 ................................................................................. 8

49 U.S.C. § 40103 ............................................................................. 13

49 U.S.C. § 46110 ............................................................................. 15

54 U.S.C. § 306108 ........................................................................... 17


<u>Regulations</u>

14 C.F.R. § 91.141 ............................................................................. 18

23 C.F.R. § 774.3 .............................................................................. 19

36 C.F.R. § 800.2 .............................................................................. 22

36 C.F.R. § 800.3 .............................................................................. 28

36 C.F.R. § 800.4 .............................................................................. 31

36 C.F.R. § 800.5 .............................................................................. 36

36 C.F.R. § 800.6 .............................................................................. 40

36 C.F.R. § 800.16 ............................................................................ 45

Establishment of Prohibited Area P-75; New York, NY,
91 Fed. Reg. 23,187 (Apr. 30, 2026) ................................................. 49

Current through Public Law 119-93, approved May 19, 2026.

*United States Code Service > TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146) > Part I. The Agencies Generally (Chs. 1 — 10) > CHAPTER 5. Administrative Procedure (Subchs. I — V) > Subchapter II. Administrative Procedure (§§ 551 — 559)*

## § 553. Rule making

**(a)** This section applies, according to the provisions thereof, except to the extent that there is involved—

**(1)** a military or foreign affairs function of the United States; or

**(2)** a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

**(b)** General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

**(1)** a statement of the time, place, and nature of public rule making proceedings;

**(2)** reference to the legal authority under which the rule is proposed;

**(3)** either the terms or substance of the proposed rule or a description of the subjects and issues involved; and

**(4)** the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

Except when notice or hearing is required by statute, this subsection does not apply—

**(A)** to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

**(B)** when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**(c)**  After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title [5 USCS §§ 556 and 557] apply instead of this subsection.

**(d)**  The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

>  **(1)**  a substantive rule which grants or recognizes an exemption or relieves a restriction;

>  **(2)**  interpretative rules and statements of policy; or

>  **(3)**  as otherwise provided by the agency for good cause found and published with the rule.

**(e)**  Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

## History

## HISTORY:

Added Sept. 6, 1966, P. L. 89-554, § 1, 80 Stat. 383; July 25, 2023, P.L. 118-9, § 2, 137 Stat. 55.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

*United States Code Service > TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164) > CHAPTER 55. NATIONAL ENVIRONMENTAL POLICY (§§ 4321 — 4370m-12) > POLICIES AND GOALS (§§ 4331 — 4336f)*

## § 4336. Procedure for determination of level of review

**(a) Threshold determinations.** An agency is not required to prepare an environmental document with respect to a proposed agency action if—

**(1)** the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5, United States Code [5 USCS §§ 500 et seq.];

**(2)** the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with section 109 of this Act [42 USCS § 4336c], or another provision of law;

**(3)** the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law; or

**(4)** the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action.

**(b) Levels of review.**

**(1)** Environmental impact statement. An agency shall issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment.

**(2)** Environmental assessment. An agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown, unless the agency finds that the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with section 109 of this Act [42 USCS § 4336c], or another provision of law. Such environmental assessment shall be a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary.

**(3)** Sources of information. In making a determination under this subsection, an agency—

**(A)** may make use of any reliable data source; and

**(B)** is not required to undertake new scientific or technical research unless the new scientific or technical research is essential to a reasoned choice among alternatives, and the overall costs and time frame of obtaining it are not unreasonable.

## History

Jan. 1, 1970, P.L. 91-190, Title I, § 106, as added June 3, 2023, P.L. 118-5, Div C, Title III, § 321(b), 137 Stat. 39.

United States Code Service
Copyright © 2026 All rights reserved.

Current through Public Law 119-93, approved May 19, 2026.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164)  >
CHAPTER 55. NATIONAL ENVIRONMENTAL POLICY (§§ 4321 — 4370m-12)  >  POLICIES AND GOALS
(§§ 4331 — 4336f)*

## § 4336e. Definitions

In this title [42 USCS §§ 4331 et seq.]:

**(1)** Categorical exclusion. The term "categorical exclusion" means a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of section 102(2)(C) [42 USCS § 4332(2)(C)].

**(2)** Cooperating agency. The term "cooperating agency" means any Federal, State, Tribal, or local agency that has been designated as a cooperating agency under section 107(a)(3) [42 USCS § 4336a(a)(3)].

**(3)** Council. The term "Council" means the Council on Environmental Quality established in title II [42 USCS §§ 4341 et seq.].

**(4)** Environmental assessment. The term "environmental assessment" means an environmental assessment prepared under section 106(b)(2) [42 USCS § 4336(b)(2)].

**(5)** Environmental document. The term "environmental document" means an environmental impact statement, an environmental assessment, or a finding of no significant impact.

**(6)** Environmental impact statement. The term "environmental impact statement" means a detailed written statement that is required by section 102(2)(C) [42 USCS § 4332(2)(C)].

**(7)** Finding of no significant impact. The term "finding of no significant impact" means a determination by a Federal agency that a proposed agency action does not require the issuance of an environmental impact statement.

**(8)** Participating Federal agency. The term "participating Federal agency" means a Federal agency participating in an environmental review or authorization of an action.

**(9)** Lead agency. The term "lead agency" means, with respect to a proposed agency action—

**(A)** the agency that proposed such action; or

**(B)** if there are 2 or more involved Federal agencies with respect to such action, the agency designated under section 107(a)(1) [42 USCS § 4336a(a)(1)].

**(10)** Major Federal action.

**(A)** In general. The term "major Federal action" means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility.

**(B)** Exclusion. The term "major Federal action" does not include—

**(i)** a non-Federal action—

**(I)** with no or minimal Federal funding; or

**(II)** with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project;

**(ii)** funding assistance solely in the form of general revenue sharing funds which do not provide Federal agency compliance or enforcement responsibility over the subsequent use of such funds;

**(iii)** loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action;

**(iv)** business loan guarantees provided by the Small Business Administration pursuant to section 7(a) or (b) [and] of the Small Business Act (U.S.C. 636(a) [15 U.S.C. 636(a) or (b)]), or title V of the Small Business Investment Act of 1958 (15 U.S.C. 695 et seq.);

**(v)** bringing judicial or administrative civil or criminal enforcement actions;

**(vi)** extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States; or

**(vii)** activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority.

**(11)** Programmatic environmental document. The term "programmatic environmental document" means an environmental impact statement or

environmental assessment analyzing all or some of the environmental effects of a policy, program, plan, or group of related actions.

**(12)** Proposal. The term "proposal" means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects.

**(13)** Special expertise. The term "special expertise" means statutory responsibility, agency mission, or related program experience.

## History

Jan. 1, 1970, P.L. 91-190, Title I, § 111, as added June 3, 2023, P.L. 118-5, Div C, Title III, § 321(b), 137 Stat. 44.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

*United States Code Service > TITLE 49. TRANSPORTATION (§§ 101 — 80504) > Subtitle I. Department of Transportation (Chs. 1 — 7) > CHAPTER 3. General Duties and Power (Subchs. I — III) > Subchapter I. Duties of The Secretary of Transportation (§§ 301 — 313)*

## § 303. Policy on lands, wildlife and waterfowl refuges, and historic sites

**(a)** It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

**(b)** The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States, in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands crossed by transportation activities or facilities.

**(c) Approval of programs and projects.** Subject to subsections (d) and (h), the Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—

　**(1)** there is no prudent and feasible alternative to using that land; and

　**(2)** the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

**(d) De minimis impacts.**

　**(1)** Requirements.

　　**(A)** Requirements for historic sites. The requirements of this section shall be considered to be satisfied with respect to an area described in paragraph (2) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area.

**(B)** Requirements for parks, recreation areas, and wildlife or waterfowl refuges. The requirements of subsection (c)(1) shall be considered to be satisfied with respect to an area described in paragraph (3) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area. The requirements of subsection (c)(2) with respect to an area described in paragraph (3) shall not include an alternatives analysis.

**(C)** Criteria. In making any determination under this subsection, the Secretary shall consider to be part of a transportation program or project any avoidance, minimization, mitigation, or enhancement measures that are required to be implemented as a condition of approval of the transportation program or project.

**(2)** Historic sites. With respect to historic sites, the Secretary may make a finding of de minimis impact only if—

**(A)** the Secretary has determined, in accordance with the consultation process required under section 306108 of title 54, United States Code, that—

**(i)** the transportation program or project will have no adverse effect on the historic site; or

**(ii)** there will be no historic properties affected by the transportation program or project;

**(B)** the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisory Council on Historic Preservation if the Council is participating in the consultation process); and

**(C)** the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

**(3)** Parks, recreation areas, and wildlife or waterfowl refuges. With respect to parks, recreation areas, or wildlife or waterfowl refuges, the Secretary may make a finding of de minimis impact only if—

**(A)** the Secretary has determined, after public notice and opportunity for public review and comment, that the transportation program or project will not adversely affect the activities, features, and attributes of the park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section; and

**(B)** the finding of the Secretary has received concurrence from the officials with jurisdiction over the park, recreation area, or wildlife or waterfowl refuge.

**(e) Satisfaction of requirements for certain historic sites.**

**(1)** In general. The Secretary shall—

**(A)** align, to the maximum extent practicable, the requirements of this section with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and section 306108 of title 54 [54 USCS § 306108], including implementing regulations; and

**(B)** not later than 90 days after the date of enactment of this subsection [enacted Dec. 4, 2015], coordinate with the Secretary of the Interior and the Executive Director of the Advisory Council on Historic Preservation (referred to in this subsection as the "Council") to establish procedures to satisfy the requirements described in subparagraph (A) (including regulations).

**(2)** Avoidance alternative analysis.

**(A)** In general. If, in an analysis required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), the Secretary determines that there is no feasible or prudent alternative to avoid use of a historic site, the Secretary may—

**(i)** include the determination of the Secretary in the analysis required under that Act [42 USCS §§ 4321 et seq.];

**(ii)** provide a notice of the determination to—

**(I)** each applicable State historic preservation officer and tribal historic preservation officer;

**(II)** the Council, if the Council is participating in the consultation process under section 306108 of title 54 [54 USCS § 306108]; and

**(III)** the Secretary of the Interior; and

**(iii)** request from the applicable preservation officer, the Council, and the Secretary of the Interior a concurrence that the determination is sufficient to satisfy subsection (c)(1).

**(B)** Concurrence. If the applicable preservation officer, the Council, and the Secretary of the Interior each provide a concurrence requested under subparagraph (A)(iii), no further analysis under subsection (c)(1) shall be required.

**(C)** Publication. A notice of a determination, together with each relevant concurrence to that determination, under subparagraph (A) shall—

    **(i)** be included in the record of decision or finding of no significant impact of the Secretary; and

    **(ii)** be posted on an appropriate Federal website by not later than 3 days after the date of receipt by the Secretary of all concurrences requested under subparagraph (A)(iii).

**(3)** Aligning historical reviews.

    **(A)** In general. If the Secretary, the applicable preservation officer, the Council, and the Secretary of the Interior concur that no feasible and prudent alternative exists as described in paragraph (2), the Secretary may provide to the applicable preservation officer, the Council, and the Secretary of the Interior notice of the intent of the Secretary to satisfy subsection (c)(2) through the consultation requirements of section 306108 of title 54 [54 USCS § 306108].

    **(B)** Satisfaction of conditions. To satisfy subsection (c)(2), the applicable preservation officer, the Council, and the Secretary of the Interior shall concur in the treatment of the applicable historic site described in the memorandum of agreement or programmatic agreement developed under section 306108 of title 54 [54 USCS § 306108].

**(f) References to past transportation environmental authorities.**

    **(1)** Section 4(f) requirements. The requirements of this section are commonly referred to as section 4(f) requirements (see section 4(f) of the Department of Transportation Act (Public Law 89-670; 80 Stat. 934) as in effect before the repeal of that section).

    **(2)** Section 106 requirements. The requirements of section 306108 of title 54 [54 USCS § 306108] are commonly referred to as section 106 requirements (see section 106 of the National Historic Preservation Act of 1966 (Public Law 89-665; 80 Stat. 917) as in effect before the repeal of that section).

**(g) Bridge exemption from consideration.** A common post-1945 concrete or steel bridge or culvert (as described in 77 Fed. Reg. 68790) that is exempt from individual review under section 306108 of title 54 [54 USCS § 306108] shall be exempt from consideration under this section.

**(h) Rail and transit.**

    **(1)** In general. Improvements to, or the maintenance, rehabilitation, or operation of, railroad or rail transit lines or elements thereof that are in use or were

historically used for the transportation of goods or passengers shall not be considered a use of a historic site under subsection (c), regardless of whether the railroad or rail transit line or element thereof is listed on, or eligible for listing on, the National Register of Historic Places.

**(2)** Exceptions.

**(A)** In general. Paragraph (1) shall not apply to—

**(i)** stations; or

**(ii)** bridges or tunnels located on—

**(I)** railroad lines that have been abandoned; or

**(II)** transit lines that are not in use.

**(B)** Clarification with respect to certain bridges and tunnels. The bridges and tunnels referred to in subparagraph (A)(ii) do not include bridges or tunnels located on railroad or transit lines—

**(i)** over which service has been discontinued; or

**(ii)** that have been railbanked or otherwise reserved for the transportation of goods or passengers.

## History

## HISTORY:

Jan. 12, 1983, P. L. 97-449, § 1(b), 96 Stat. 2419; April 2, 1987, P. L. 100-17, Title I, § 133(d), 101 Stat. 173; Aug. 10, 2005, P. L. 109-59, Title VI, § 6009(a)(2), 119 Stat. 1875; Dec. 19, 2014, P. L. 113-287, § 5(p), 128 Stat. 3272; Dec. 4, 2015, P. L. 114-94, Div A, Title I, Subtitle C, §§ 1301(b), 1302(b), 1303(b), Title XI, Subtitle E, § 11502(b), 129 Stat. 1376, 1377, 1378, 1690.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

Current through Public Law 119-93, approved May 19, 2026.

*United States Code Service > TITLE 49. TRANSPORTATION (§§ 101 — 80504) > Subtitle VII. Aviation Programs (Pts. A — E) > Part A. Air Commerce and Safety (Subpts. I — IV) > Subpart I. General (Ch. 401) > CHAPTER 401. General Provisions (§§ 40101 — 40132)*

## § 40103. Sovereignty and use of airspace

**(a) Sovereignty and public right of transit.**

**(1)** The United States Government has exclusive sovereignty of airspace of the United States.

**(2)** A citizen of the United States has a public right of transit through the navigable airspace. To further that right, the Secretary of Transportation shall consult with the Architectural and Transportation Barriers Compliance Board established under section 502 of the Rehabilitation Act of 1973 (29 U.S.C. 792) before prescribing a regulation or issuing an order or procedure that will have a significant impact on the accessibility of commercial airports or commercial air transportation for individuals with disabilities.

**(b) Use of airspace.**

**(1)** The Administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. The Administrator may modify or revoke an assignment when required in the public interest.

**(2)** The Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for—

**(A)** navigating, protecting, and identifying aircraft;

**(B)** protecting individuals and property on the ground;

**(C)** using the navigable airspace efficiently; and

**(D)** preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

**(3)** To establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security, the Administrator, in consultation with the Secretary of Defense, shall—

**(A)** establish areas in the airspace the Administrator decides are necessary in the interest of national defense; and

**(B)** by regulation or order, restrict or prohibit flight of civil aircraft that the Administrator cannot identify, locate, and control with available facilities in those areas.

**(4)** Notwithstanding the military exception in section 553(a)(1) of title 5 [5 USCS § 553(a)(1)], subchapter II of chapter 5 of title 5 [5 USCS §§ 551 et seq.] applies to a regulation prescribed under this subsection.

**(c) Foreign aircraft.**   A foreign aircraft, not part of the armed forces of a foreign country, may be navigated in the United States as provided in section 41703 of this title [49 USCS § 41703].

**(d) Aircraft of armed forces of foreign countries.**   Aircraft of the armed forces of a foreign country may be navigated in the United States only when authorized by the Secretary of State.

**(e) No exclusive rights at certain facilities.**   A person does not have an exclusive right to use an air navigation facility on which Government money has been expended. However, providing services at an airport by only one fixed-based operator is not an exclusive right if—

**(1)** it is unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide the services; and

**(2)** allowing more than one fixed-based operator to provide the services requires a reduction in space leased under an agreement existing on September 3, 1982, between the operator and the airport.

## History

**HISTORY:**

July 5, 1994, P. L. 103-272, § 1(e), 108 Stat. 1101; May 16, 2024, P.L. 118-63, Title V, Subtitle B, § 550(a), 138 Stat. 1212.

United States Code Service
Copyright © 2026 All rights reserved.

Current through Public Law 119-95, approved May 29, 2026.

*United States Code Service > TITLE 49. TRANSPORTATION (§§ 101 — 80504) > Subtitle VII. Aviation Programs (Pts. A — E) > Part A. Air Commerce and Safety (Subpts. I — IV) > Subpart IV. Enforcement and Penalties (Chs. 461 — 465) > CHAPTER 461. Investigations and Proceedings (§§ 46101 — 46111)*

## § 46110. Judicial review

**(a) Filing and venue.**   Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title [49 USCS § 41307 or 41509(f)], a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part [49 USCS §§ 40101 et seq.], part B [49 USCS §§ 47101 et seq.], or subsection (l) or (r) of section 114 [49 USCS § 114] may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

**(b) Judicial procedures.**   When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, as appropriate. The Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28 [28 USCS § 2112].

**(c) Authority of court.**   When the petition is sent to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation

Administration to conduct further proceedings. After reasonable notice to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, if supported by substantial evidence, are conclusive.

**(d) Requirement for prior objection.** In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration only if the objection was made in the proceeding conducted by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration or if there was a reasonable ground for not making the objection in the proceeding.

**(e) Supreme Court review.** A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

**History**

**HISTORY:**

July 5, 1994, P. L. 103-272, § 1(e), 108 Stat. 1230; Nov. 19, 2001, P. L. 107-71, Title I, § 140(b)(1), (2), 115 Stat. 641; Dec. 12, 2003, P. L. 108-176, Title II, Subtitle B, § 228, 117 Stat. 2532; Oct. 5, 2018, P.L. 115-254, Div K, Title I, Subtitle I, § 1991(f)(1)-(4), 132 Stat. 3642; May 16, 2024, P.L. 118-63, Title XI, § 1101(s), 138 Stat. 1414.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

Current through Public Law 119-93, approved May 19, 2026.

*United States Code Service  >  TITLE 54. NATIONAL PARK SERVICE AND RELATED PROGRAMS (§§ 100101 — 320303)  >  Subtitle III. National Preservation Programs (§§ 300101 — 320303)  >  Division A. Historic Preservation (Subpts. 1 — 6)  >  Subdivision 5. Federal Agency Historic Preservation Responsibilities (Ch. 3061)  >  CHAPTER 3061. Program Responsibilities and Authorities (Subchs. I — IV)  >  Subchapter I. In General (§§ 306101 — 306114)*

## § 306108. Effect of undertaking on historic property

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

## History

## HISTORY:

Dec. 19, 2014, P. L. 113-287, § 3, 128 Stat. 3227.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

# 14 CFR 91.141

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  > Title 14 Aeronautics and Space  > Chapter I — Federal Aviation Administration, Department of Transportation  > Subchapter F — Air Traffic and General Operating Rules  > Part 91 — General Operating and Flight Rules  > Subpart B — Flight Rules  > Special Federal Aviation Regulations  > General*

## § 91.141 Flight restrictions in the proximity of the Presidential and other parties.

No person may operate an aircraft over or in the vicinity of any area to be visited or traveled by the President, the Vice President, or other public figures contrary to the restrictions established by the Administrator and published in a Notice to Airmen (NOTAM).

## Statutory Authority

Authority Note Applicable to 14 CFR Ch. I, Subch. F, Pt. 91

## History

[Docket No. 18334, 54 FR 34294, Aug. 18, 1989]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

End of Document

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  > Title 23 Highways  > Chapter I — Federal Highway Administration, Department of Transportation  > Subchapter H — Right-Of-Way and Environment  > Part 774 — Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites (Section 4(F))*

## § 774.3 Section 4(f) approvals.

The Administration may not approve the use, as defined in § 774.17, of Section 4(f) property unless a determination is made under paragraph (a) or (b) of this section.

**(a)** The Administration determines that:

**(1)** There is no feasible and prudent avoidance alternative, as defined in § 774.17, to the use of land from the property; and

**(2)** The action includes all possible planning, as defined in § 774.17, to minimize harm to the property resulting from such use; or

**(b)** The Administration determines that the use of the property, including any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures) committed to by the applicant, will have a de minimis impact, as defined in § 774.17, on the property.

**(c)** If the analysis in paragraph (a)(1) of this section concludes that there is no feasible and prudent avoidance alternative, then the Administration may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that:

**(1)** Causes the least overall harm in light of the statute's preservation purpose. The least overall harm is determined by balancing the following factors:

**(i)** The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

**(ii)** The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

**(iii)** The relative significance of each Section 4(f) property;

**(iv)** The views of the official(s) with jurisdiction over each Section 4(f) property;

**(v)** The degree to which each alternative meets the purpose and need for the project;

**(vi)** After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

**(vii)** Substantial differences in costs among the alternatives.

**(2)** The alternative selected must include all possible planning, as defined in § 774.17, to minimize harm to Section 4(f) property.

**(d)** Programmatic Section 4(f) evaluations are a time-saving procedural alternative to preparing individual Section 4(f) evaluations under paragraph (a) of this section for certain minor uses of Section 4(f) property. Programmatic Section 4(f) evaluations are developed by the Administration based on experience with a specific set of conditions that includes project type, degree of use and impact, and evaluation of avoidance alternatives.n1 An approved programmatic Section 4(f) evaluation may be relied upon to cover a particular project only if the specific conditions in the programmatic evaluation are met

n1 FHWA Section 4(f) Programmatic Evaluations can be found at www.environment.fhwa.dot.gov/4f/4fnationwideevals.asp.

**(1)** The determination whether a programmatic Section 4(f) evaluation applies to the use of a specific Section 4(f) property shall be documented as specified in the applicable programmatic Section 4(f) evaluation.

**(2)** The Administration may develop additional programmatic Section 4(f) evaluations. Proposed new or revised programmatic Section 4(f) evaluations will be coordinated with the Department of Interior, Department of Agriculture, and Department of Housing and Urban Development, and published in the Federal Register for comment prior to being finalized. New or revised programmatic Section 4(f) evaluations shall be reviewed for legal sufficiency and approved by the Headquarters Office of the Administration.

**(e)** The coordination requirements in § 774.5 must be completed before the Administration may make Section 4(f) approvals under this section. Requirements for the documentation and timing of Section 4(f) approvals are located in §§ 774.7 and 774.9, respectively.

## Statutory Authority

Authority Note Applicable to 23 CFR Ch. I, Subch. H, Pt. 774

## History

[73 FR 13368, 13395, Mar. 12, 2008; 73 FR 31609, 31610, June 3, 2008; 83 FR 54480, 54506, Oct. 29, 2018]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

End of Document

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  > Title 36 Parks, Forests, and Public Property  > Chapter VIII — Advisory Council on Historic Preservation  > Part 800 — Protection of Historic Properties  > Subpart A — Purposes and Participants*

## § 800.2 Participants in Section 106 process.

**(a)** Agency official. It is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance in accordance with subpart B of this part. The agency official has approval authority for the undertaking and can commit the Federal agency to take appropriate action for a specific undertaking as a result of section 106 compliance. For the purposes of subpart C of this part, the agency official has the authority to commit the Federal agency to any obligation it may assume in the implementation of a program alternative. The agency official may be a State, local, or tribal government official who has been delegated legal responsibility for compliance with section 106 in accordance with Federal law.

> **(1)** Professional standards. Section 112(a)(1)(A) of the act requires each Federal agency responsible for the protection of historic resources, including archeological resources, to ensure that all actions taken by employees or contractors of the agency shall meet professional standards under regulations developed by the Secretary.

> **(2)** Lead Federal agency. If more than one Federal agency is involved in an undertaking, some or all the agencies may designate a lead Federal agency, which shall identify the appropriate official to serve as the agency official who shall act on their behalf, fulfilling their collective responsibilities under section 106. Those Federal agencies that do not designate a lead Federal agency remain individually responsible for their compliance with this part.

> **(3)** Use of contractors. Consistent with applicable conflict of interest laws, the agency official may use the services of applicants, consultants, or designees to prepare information, analyses and recommendations under this part. The agency official remains legally responsible for all required findings and determinations. If a document or study is prepared by a non-Federal party, the agency official is

responsible for ensuring that its content meets applicable standards and guidelines.

**(4)** Consultation. The agency official shall involve the consulting parties described in paragraph (c) of this section in findings and determinations made during the section 106 process. The agency official should plan consultations appropriate to the scale of the undertaking and the scope of Federal involvement and coordinated with other requirements of other statutes, as applicable, such as the National Environmental Policy Act, the Native American Graves Protection and Repatriation Act, the American Indian Religious Freedom Act, the Archeological Resources Protection Act, and agency-specific legislation. The Council encourages the agency official to use to the extent possible existing agency procedures and mechanisms to fulfill the consultation requirements of this part.

**(b)** Council. The Council issues regulations to implement section 106, provides guidance and advice on the application of the procedures in this part, and generally oversees the operation of the section 106 process. The Council also consults with and comments to agency officials on individual undertakings and programs that affect historic properties.

**(1)** Council entry into the section 106 process. When the Council determines that its involvement is necessary to ensure that the purposes of section 106 and the act are met, the Council may enter the section 106 process. Criteria guiding Council decisions to enter the section 106 process are found in appendix A to this part. The Council will document that the criteria have been met and notify the parties to the section 106 process as required by this part.

**(2)** Council assistance. Participants in the section 106 process may seek advice, guidance and assistance from the Council on the application of this part to specific undertakings, including the resolution of disagreements, whether or not the Council is formally involved in the review of the undertaking. If questions arise regarding the conduct of the section 106 process, participants are encouraged to obtain the Council's advice on completing the process.

**(c)** Consulting parties. The following parties have consultative roles in the section 106 process.

**(1)** State historic preservation officer.

**(i)** The State historic preservation officer (SHPO) reflects the interests of the State and its citizens in the preservation of their cultural heritage. In accordance with section 101(b)(3) of the act, the SHPO advises and assists Federal agencies in carrying out their section 106 responsibilities and cooperates with such agencies, local governments and organizations and

individuals to ensure that historic properties are taking into consideration at all levels of planning and development.

**(ii)** If an Indian tribe has assumed the functions of the SHPO in the section 106 process for undertakings on tribal lands, the SHPO shall participate as a consulting party if the undertaking takes place on tribal lands but affects historic properties off tribal lands, if requested in accordance with § 800.3(c)(1), or if the Indian tribe agrees to include the SHPO pursuant to § 800.3(f)(3).

**(2)** Indian tribes and Native Hawaiian organizations.

**(i)** Consultation on tribal lands.

**(A)** Tribal historic preservation officer. For a tribe that has assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the tribal historic preservation officer (THPO) appointed or designated in accordance with the act is the official representative for the purposes of section 106. The agency official shall consult with the THPO in lieu of the SHPO regarding undertakings occurring on or affecting historic properties on tribal lands.

**(B)** Tribes that have not assumed SHPO functions. When an Indian tribe has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the agency official shall consult with a representative designated by such Indian tribe in addition to the SHPO regarding undertakings occurring on or affecting historic properties on its tribal lands. Such Indian tribes have the same rights of consultation and concurrence that the THPOs are given throughout subpart B of this part, except that such consultations shall be in addition to and on the same basis as consultation with the SHPO.

**(ii)** Consultation on historic properties of significance to Indian tribes and Native Hawaiian organizations. Section 101(d)(6)(B) of the act requires the agency official to consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking. This requirement applies regardless of the location of the historic property. Such Indian tribe or Native Hawaiian organization shall be a consulting party.

**(A)** The agency official shall ensure that consultation in the section 106 process provides the Indian tribe or Native Hawaiian organization a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views

on the undertaking's effects on such properties, and participate in the resolution of adverse effects. It is the responsibility of the agency official to make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process. Consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties.

**(B)** The Federal Government has a unique legal relationship with Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions. Consultation with Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty. Nothing in this part alters, amends, repeals, interprets, or modifies tribal sovereignty, any treaty rights, or other rights of an Indian tribe, or preempts, modifies, or limits the exercise of any such rights.

**(C)** Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government or the governing body of a Native Hawaiian organization. Consultation with Indian tribes and Native Hawaiian organizations should be conducted in a manner sensitive to the concerns and needs of the Indian tribe or Native Hawaiian organization.

**(D)** When Indian tribes and Native Hawaiian organizations attach religious and cultural significance to historic properties off tribal lands, section 101(d)(6)(B) of the act requires Federal agencies to consult with such Indian tribes and Native Hawaiian organizations in the section 106 process. Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes and Native Hawaiian organizations and should consider that when complying with the procedures in this part.

**(E)** An Indian tribe or a Native Hawaiian organization may enter into an agreement with an agency official that specifies how they will carry out responsibilities under this part, including concerns over the confidentiality of information. An agreement may cover all aspects of tribal participation in the section 106 process, provided that no modification may be made in the roles of other parties to the section 106 process without their consent. An agreement may grant the Indian tribe or Native Hawaiian organization additional rights to participate or concur in agency decisions in the section 106 process beyond those specified in subpart B of this part. The agency

25

official shall provide a copy of any such agreement to the Council and the appropriate SHPOs.

(F) An Indian tribe that has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act may notify the agency official in writing that it is waiving its rights under § 800.6(c)(1) to execute a memorandum of agreement.

(3) Representatives of local governments. A representative of a local government with jurisdiction over the area in which the effects of an undertaking may occur is entitled to participate as a consulting party. Under other provisions of Federal law, the local government may be authorized to act as the agency official for purposes of section 106.

(4) Applicants for Federal assistance, permits, licenses, and other approvals. An applicant for Federal assistance or for a Federal permit, license, or other approval is entitled to participate as a consulting party as defined in this part. The agency official may authorize an applicant or group of applicants t of apiate consultation with the SHPO/THPO and others, but remains legally responsible for all findings and determinations charged to the agency official. The agency official shall notify the SHPO/THPO when an applicant or group of applicants is so authorized. A Federal agency may authorize all applicants in a specific program pursuant to this section by providing notice to all SHPO/THPOs. Federal agencies that provide authorizations to applicants remain responsible for their government-to-government relationships with Indian tribes.

(5) Additional consulting parties. Certain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties.

(d) The public.

(1) Nature of involvement. The views of the public are essential to informed Federal decisionmaking in the section 106 process. The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, confidentiality concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking.

(2) Providing notice and information. The agency official must, except where appropriate to protect confidentiality concerns of affected parties, provide the public with information about an undertaking and its effects on historic properties and seek public comment and input. Members of the public may also

provide views on their own initiative for the agency official to consider in decisionmaking.

**(3)** Use of agency procedures. The agency official may use the agency's procedures for public involvement under the National Environmental Policy Act or other program requirements in lieu of public involvement requirements in subpart B of this part, if they provide adequate opportunities for public involvement consistent with this subpart.

## Statutory Authority

Authority Note Applicable to 36 CFR Ch. VIII, Pt. 800

## History

[51 FR 31118, Sept. 2, 1986; 64 FR 27044, 27071, May 18, 1999; 65 FR 77698, 77726, Dec. 12, 2000]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2026 All rights reserved.

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  > Title 36 Parks, Forests, and Public Property  > Chapter VIII — Advisory Council on Historic Preservation  > Part 800 — Protection of Historic Properties  > Subpart B — The Section 106 Process*

## § 800.3 Initiation of the section 106 process.

**(a)** Establish undertaking. The agency official shall determine whether the proposed Federal action is an undertaking as defined in § 800.16(y) and, if so, whether it is a type of activity that has the potential to cause effects on historic properties.

> **(1)** No potential to cause effects. If the undertaking is a type of activity that does not have the potential to cause effects on historic properties, assuming such historic properties were present, the agency official has no further obligations under section 106 or this part.

> **(2)** Program alternatives. If the review of the undertaking is governed by a Federal agency program alternative established under § 800.14 or a programmatic agreement in existence before January 11, 2001, the agency official shall follow the program alternative.

**(b)** Coordinate with other reviews. The agency official should coordinate the steps of the section 106 process, as appropriate, with the overall planning schedule for the undertaking and with any reviews required under other authorities such as the National Environmental Policy Act, the Native American Graves Protection and Repatriation Act, the American Indian Religious Freedom Act, the Archeological Resources Protection Act, and agency-specific legislation, such as section 4(f) of the Department of Transportation Act. Where consistent with the procedures in this subpart, the agency official may use information developed for other reviews under Federal, State, or tribal law to meet the requirements of section 106.

**(c)** Identify the appropriate SHPO and/or THPO. As part of its initial planning, the agency official shall determine the appropriate SHPO or SHPOs to be involved in the section 106 process. The agency official shall also determine whether the undertaking may occur on or affect historic properties on any tribal lands and, if so, whether a THPO has assumed the duties of the SHPO. The agency official shall then initiate consultation with the appropriate officer or officers.

**(1)** Tribal assumption of SHPO responsibilities. Where an Indian tribe has assumed the section 106 responsibilities of the SHPO on tribal lands pursuant to section 101(d)(2) of the act, consultation for undertakings occurring on tribal land or for effects on tribal land is with the THPO for the Indian tribe in lieu of the SHPO. Section 101(d)(2)(D)(iii) of the act authorizes owners of properties on tribal lands which are neither owned by a member of the tribe nor held in trust by the Secretary for the benefit of the tribe to request the SHPO to participate in the section 106 process in addition to the THPO.

**(2)** Undertakings involving more than one State. If more than one State is involved in an undertaking, the involved SHPOs may agree to designate a lead SHPO to act on their behalf in the section 106 process, including taking actions that would conclude the section 106 process under this subpart.

**(3)** Conducting consultation. The agency official should consult with the SHPO/THPO in a manner appropriate to the agency planning process for the undertaking and to the nature of the undertaking and its effects on historic properties.

**(4)** Failure of the SHPO/THPO to respond. If the SHPO/THPO fails to respond within 30 days of receipt of a request for review of a finding or determination, the agency official may either proceed to the next step in the process based on the finding or determination or consult with the Council in lieu of the SHPO/THPO. If the SHPO/THPO re-enters the Section 106 process, the agency official shall continue the consultation without being required to reconsider previous findings or determinations.

**(d)** Consultation on tribal lands. Where the Indian tribe has not assumed the responsibilities of the SHPO on tribal lands, consultation with the Indian tribe regarding undertakings occurring on such tribe's lands or effects on such tribal lands shall be in addition to and on the same basis as consultation with the SHPO. If the SHPO has withdrawn from the process, the agency official may complete the section 106 process with the Indian tribe and the Council, as appropriate. An Indian tribe may enter into an agreement with a SHPO or SHPOs specifying the SHPO's participation in the section 106 process for undertakings occurring on or affecting historic properties on tribal lands.

**(e)** Plan to involve the public. In consultation with the SHPO/THPO, the agency official shall plan for involving the public in the section 106 process. The agency official shall identify the appropriate points for seeking public input and for notifying the public of proposed actions, consistent with § 800.2(d).

**(f)** Identify other consulting parties. In consultation with the SHPO/THPO, the agency official shall identify any other parties entitled to be consulting parties and invite them

to participate as such in the section 106 process. The agency official may invite others to participate as consulting parties as the section 106 process moves forward.

> **(1)** Involving local governments and applicants. The agency official shall invite any local governments or applicants that are entitled to be consulting parties under § 800.2(c).

> **(2)** Involving Indian tribes and Native Hawaiian organizations. The agency official shall make a reasonable and good faith effort to identify any Indian tribes or Native Hawaiian organizations that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties. Such Indian tribe or Native Hawaiian organization that requests in writing to be a consulting party shall be one.

> **(3)** Requests to be consulting parties. The agency official shall consider all written requests of individuals and organizations to participate as consulting parties and, in consultation with the SHPO/THPO and any Indian tribe upon whose tribal lands an undertaking occurs or affects historic properties, determine which should be consulting parties.

**(g)** Expediting consultation. A consultation by the agency official with the SHPO/THPO and other consulting parties may address multiple steps in §§ 800.3 through 800.6 where the agency official and the SHPO/THPO agree it is appropriate as long as the consulting parties and the public have an adequate opportunity to express their views as provided in § 800.2(d).

## Statutory Authority

Authority Note Applicable to 36 CFR Ch. VIII, Pt. 800

## History

[51 FR 31118, Sept. 2, 1986; 64 FR 27044, 27073, May 18, 1999; 65 FR 77698, 77728, Dec. 12, 2000]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  > Title 36 Parks, Forests, and Public Property  > Chapter VIII — Advisory Council on Historic Preservation  > Part 800 — Protection of Historic Properties  > Subpart B — The Section 106 Process*

## § 800.4 Identification of historic properties.

**(a)** Determine scope of identification efforts. In consultation with the SHPO/THPO, the agency official shall:

> **(1)** Determine and document the area of potential effects, as defined in § 800.16(d);

> **(2)** Review existing information on historic properties within the area of potential effects, including any data concerning possible historic properties not yet identified;

> **(3)** Seek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties; and

> **(4)** Gather information from any Indian tribe or Native Hawaiian organization identified pursuant to § 800.3(f) to assist in identifying properties, including those located off tribal lands, which may be of religious and cultural significance to them and may be eligible for the National Register, recognizing that an Indian tribe or Native Hawaiian organization may be reluctant to divulge specific information regarding the location, nature, and activities associated with such sites. The agency official should address concerns raised about confidentiality pursuant to § 800.11(c).

**(b)** Identify historic properties. Based on the information gathered under paragraph (a) of this section, and in consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that might attach religious and cultural significance to properties within the area of potential effects, the agency official shall take the steps necessary to identify historic properties within the area of potential effects.

> **(1)** Level of effort. The agency official shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include

background research, consultation, oral history interviews, sample field investigation, and field survey. The agency official shall take into account past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects. The Secretary's standards and guidelines for identification provide guidance on this subject. The agency official should also consider other applicable professional, State, tribal, and local laws, standards, and guidelines. The agency official shall take into account any confidentiality concerns raised by Indian tribes or Native Hawaiian organizations during the identification process.

(2) Phased identification and evaluation. Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process to conduct identification and evaluation efforts. The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to § 800.6, a programmatic agreement executed pursuant to § 800.14(b), or the documents used by an agency official to comply with the National Environmental Policy Act pursuant to § 800.8. The process should establish the likely presence of historic properties within the area of potential effects for each alternative or inaccessible area through background research, consultation and an appropriate level of field investigation, taking into account the number of alternatives under consideration, the magnitude of the undertaking and its likely effects, and the views of the SHPO/THPO and any other consulting parties. As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section.

(c) **Evaluate historic significance.**

(1) Apply National Register criteria. In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified properties and guided by the Secretary's standards and guidelines for evaluation, the agency official shall apply the National Register criteria (36 CFR part 63) to properties identified within the area of potential effects that have not been previously evaluated for National Register eligibility. The passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate properties previously determined eligible or ineligible. The agency official shall acknowledge that Indian tribes and Native Hawaiian organizations possess

special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them.

(**2**) Determine whether a property is eligible. If the agency official determines any of the National Register criteria are met and the SHPO/THPO agrees, the property shall be considered eligible for the National Register for section 106 purposes. If the agency official determines the criteria are not met and the SHPO/THPO agrees, the property shall be considered not eligible. If the agency official and the SHPO/THPO do not agree, or if the Council or the Secretary so request, the agency official shall obtain a determination of eligibility from the Secretary pursuant to 36 CFR part 63. If an Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to a property off tribal lands does not agree, it may ask the Council to request the agency official to obtain a determination of eligibility.

(**d**) Results of identification and evaluation.

(**1**) No historic properties affected. If the agency official finds that either there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them as defined in § 800.16(i), the agency official shall provide documentation of this finding, as set forth in § 800.11(d), to the SHPO/THPO. The agency official shall notify all consulting parties, including Indian tribes and Native Hawaiian organizations, and make the documentation available for public inspection prior to approving the undertaking.

(**i**) If the SHPO/THPO, or the Council if it has entered the section 106 process, does not object within 30 days of receipt of an adequately documented finding, the agency official's responsibilities under section 106 are fulfilled.

(**ii**) If the SHPO/THPO objects within 30 days of receipt of an adequately documented finding, the agency official shall either consult with the objecting party to resolve the disagreement, or forward the finding and supporting documentation to the Council and request that the Council review the finding pursuant to paragraphs (d)(1)(iv)(A) through (d)(1)(iv)(C) of this section. When an agency official forwards such requests for review to the Council, the agency official shall concurrently notify all consulting parties that such a request has been made and make the request documentation available to the public.

(**iii**) During the SHPO/THPO 30 day review period, the Council may object to the finding and provide its opinion regarding the finding to the agency official and, if the Council determines the issue warrants it, the head of the agency. A Council decision to provide its opinion to the head of an agency shall be

guided by the criteria in appendix A to this part. The agency shall then proceed according to paragraphs (d)(1)(iv)(B) and (d)(1)(iv)(C) of this section.

**(iv)**

> **(A)** Upon receipt of the request under paragraph (d)(1)(ii) of this section, the Council will have 30 days in which to review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with the Council's opinion regarding the finding. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. If the Council does not respond within 30 days of receipt of the request, the agency official's responsibilities under section 106 are fulfilled.

> **(B)** The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion before the agency reaches a final decision on the finding.

> **(C)** The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall then prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial agency finding of no historic properties affected, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

> **(D)** The Council shall retain a record of agency responses to Council opinions on their findings of no historic properties affected. The Council shall make this information available to the public.

**(2)** Historic properties affected. If the agency official finds that there are historic properties which may be affected by the undertaking, the agency official shall notify all consulting parties, including Indian tribes or Native Hawaiian organizations, invite their views on the effects and assess adverse effects, if any, in accordance with § 800.5.

## Statutory Authority

Authority Note Applicable to 36 CFR Ch. VIII, Pt. 800

## History

[51 FR 31118, Sept. 2, 1986; 64 FR 27044, 27074, May 18, 1999; 65 FR 77698, 77728, Dec. 12, 2000; 69 FR 40544, 40553, July 6, 2004]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

**End of Document**

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

## § 800.5 Assessment of adverse effects.

**(a)** Apply criteria of adverse effect. In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified historic properties, the agency official shall apply the criteria of adverse effect to historic properties within the area of potential effects. The agency official shall consider any views concerning such effects which have been provided by consulting parties and the public.

> **(1)** Criteria of adverse effect. An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

> **(2)** Examples of adverse effects. Adverse effects on historic properties include, but are not limited to:

>> **(i)** Physical destruction of or damage to all or part of the property;

>> **(ii)** Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access, that is not consistent with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines;

>> **(iii)** Removal of the property from its historic location;

**(iv)** Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

**(v)** Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;

**(vi)** Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian tribe or Native Hawaiian organization; and

**(vii)** Transfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance.

**(3)** Phased application of criteria. Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process in applying the criteria of adverse effect consistent with phased identification and evaluation efforts conducted pursuant to § 800.4(b)(2).

**(b)** Finding of no adverse effect. The agency official, in consultation with the SHPO/THPO, may propose a finding of no adverse effect when the undertaking's effects do not meet the criteria of paragraph (a)(1) of this section or the undertaking is modified or conditions are imposed, such as the subsequent review of plans for rehabilitation by the SHPO/THPO to ensure consistency with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines, to avoid adverse effects.

**(c)** Consulting party review. If the agency official proposes a finding of no adverse effect, the agency official shall notify all consulting parties of the finding and provide them with the documentation specified in § 800.11(e). The SHPO/THPO shall have 30 days from receipt to review the finding.

**(1)** Agreement with, or no objection to, finding. Unless the Council is reviewing the finding pursuant to papagraph (c)(3) of this section, the agency official may proceed after the close of the 30 day review period if the SHPO/THPO has agreed with the finding or has not provided a response, and no consulting party has objected. The agency official shall then carry out the undertaking in accordance with paragraph (d)(1) of this section.

**(2)** Disagreement with finding.

**(i)** If within the 30 day review period the SHPO/THPO or any consulting party notifies the agency official in writing that it disagrees with the finding and specifies the reasons for the disagreement in the notification, the agency

official shall either consult with the party to resolve the disagreement, or request the Council to review the finding pursuant to paragraphs (c)(3)(i) and (c)(3)(ii) of this section. The agency official shall include with such request the documentation specified in § 800.11(e). The agency official shall also concurrently notify all consulting parties that such a submission has been made and make the submission documentation available to the public.

**(ii)** If within the 30 day review period the Council provides the agency official and, if the Council determines the issue warrants it, the head of the agency, with a written opinion objecting to the finding, the agency shall then proceed according to paragraph (c)(3)(ii) of this section. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part.

**(iii)** The agency official should seek the concurrence of any Indian tribe or Native Hawaiian organization that has made known to the agency official that it attaches religious and cultural significance to a historic property subject to the finding. If such Indian tribe or Native Hawaiian organization disagrees with the finding, it may within the 30 day review period specify the reasons for disagreeing with the finding and request the Council to review and object to the finding pursuant to paragraph (c)(2)(ii) of this section.

**(3)** Council review of findings.

**(i)** When a finding is submitted to the Council pursuant to paragraph (c)(2)(i) of this section, the Council shall review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with its opinion as to whether the adverse effect criteria have been correctly applied. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The Council will provide its opinion within 15 days of receiving the documented finding from the agency official. The Council at its discretion may extend that time period for 15 days, in which case it shall notify the agency of such extension prior to the end of the initial 15 day period. If the Council does not respond within the applicable time period, the agency official's responsibilities under section 106 are fulfilled.

**(ii)**

**(A)** The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion in reaching a final decision on the finding.

**(B)** The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall prepare a summary of the decision

36 CFR 800.5

that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial finding of no adverse effect, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

**(C)** The Council shall retain a record of agency responses to Council opinions on their findings of no adverse effects. The Council shall make this information available to the public.

**(d) Results of assessment.**

**(1)** No adverse effect. The agency official shall maintain a record of the finding and provide information on the finding to the public on request, consistent with the confidentiality provisions of § 800.11(c). Implementation of the undertaking in accordance with the finding as documented fulfills the agency official's responsibilities under section 106 and this part. If the agency official will not conduct the undertaking as proposed in the finding, the agency official shall reopen consultation under paragraph (a) of this section.

**(2)** Adverse effect. If an adverse effect is found, the agency official shall consult further to resolve the adverse effect pursuant to § 800.6.

## Statutory Authority

Authority Note Applicable to 36 CFR Ch. VIII, Pt. 800

## History

[51 FR 31118, Sept. 2, 1986; 64 FR 27044, 27075, May 18, 1999; 65 FR 77698, 77729, Dec. 12, 2000; 69 FR 40544, 40553, July 6, 2004]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

End of Document

39

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

## § 800.6 Resolution of adverse effects.

**(a)** Continue consultation. The agency official shall consult with the SHPO/THPO and other consulting parties, including Indian tribes and Native Hawaiian organizations, to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties.

> **(1)** Notify the Council and determine Council participation. The agency official shall notify the Council of the adverse effect finding by providing the documentation specified in § 800.11(e).

> > **(i)** The notice shall invite the Council to participate in the consultation when:

> > > **(A)** The agency official wants the Council to participate;

> > > **(B)** The undertaking has an adverse effect upon a National Historic Landmark; or

> > > **(C)** A programmatic agreement under § 800.14(b) will be prepared;

> > **(ii)** The SHPO/THPO, an Indian tribe or Native Hawaiian organization, or any other consulting party may at any time independently request the Council to participate in the consultation.

> > **(iii)** The Council shall advise the agency official and all consulting parties whether it will participate within 15 days of receipt of notice or other request. Prior to entering the process, the Council shall provide written notice to the agency official and the consulting parties that its decision to participate meets the criteria set forth in appendix A to this part. The Council shall also advise the head of the agency of its decision to enter the process. Consultation with Council participation is conducted in accordance with paragraph (b)(2) of this section.

> > **(iv)** If the Council does not join the consultation, the agency official shall proceed with consultation in accordance with paragraph (b)(1) of this section.

**(2)** Involve consulting parties. In addition to the consulting parties identified under § 800.3(f), the agency official, the SHPO/THPO and the Council, if participating, may agree to invite other individuals or organizations to become consulting parties. The agency official shall invite any individual or organization that will assume a specific role or responsibility in a memorandum of agreement to participate as a consulting party.

**(3)** Provide documentation. The agency official shall provide to all consulting parties the documentation specified in § 800.11(e), subject to the confidentiality provisions of § 800.11(c), and such other documentation as may be developed during the consultation to resolve adverse effects.

**(4)** Involve the public. The agency official shall make information available to the public, including the documentation specified in § 800.11(e), subject to the confidentiality provisions of § 800.11(c). The agency official shall provide an opportunity for members of the public to express their views on resolving adverse effects of the undertaking. The agency official should use appropriate mechanisms, taking into account the magnitude of the undertaking and the nature of its effects upon historic properties, the likely effects on historic properties, and the relationship of the Federal involvement to the undertaking to ensure that the public's views are considered in the consultation. The agency official should also consider the extent of notice and information concerning historic preservation issues afforded the public at earlier steps in the section 106 process to determine the appropriate level of public involvement when resolving adverse effects so that the standards of § 800.2(d) are met.

**(5)** Restrictions on disclosure of information. Section 304 of the act and other authorities may limit the disclosure of information under paragraphs (a)(3) and (a)(4) of this section. If an Indian tribe or Native Hawaiian organization objects to the disclosure of information or if the agency official believes that there are other reasons to withhold information, the agency official shall comply with § 800.11(c) regarding the disclosure of such information.

**(b)** Resolve adverse effects.

**(1)** Resolution without the Council.

**(i)** The agency official shall consult with the SHPO/THPO and other consulting parties to seek ways to avoid, minimize or mitigate the adverse effects.

**(ii)** The agency official may use standard treatments established by the Council under § 800.14(d) as a basis for a memorandum of agreement.

**(iii)** If the Council decides to join the consultation, the agency official shall follow paragraph (b)(2) of this section.

**(iv)** If the agency official and the SHPO/THPO agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement. The agency official must submit a copy of the executed memorandum of agreement, along with the documentation specified in § 800.11(f), to the Council prior to approving the undertaking in order to meet the requirements of section 106 and this subpart.

**(v)** If the agency official, and the SHPO/THPO fail to agree on the terms of a memorandum of agreement, the agency official shall request the Council to join the consultation and provide the Council with the documentation set forth in § 800.11(g). If the Council decides to join the consultation, the agency official shall proceed in accordance with paragraph (b)(2) of this section. If the Council decides not to join the consultation, the Council will notify the agency and proceed to comment in accordance with § 800.7(c).

**(2)** *Resolution with Council participation.* If the Council decides to participate in the consultation, the agency official shall consult with the SHPO/THPO, the Council, and other consulting parties, including Indian tribes and Native Hawaiian organizations under § 800.2(c)(3), to seek ways to avoid, minimize or mitigate the adverse effects. If the agency official, the SHPO/THPO, and the Council agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement.

**(c)** *Memorandum of agreement.* A memorandum of agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts. The agency official shall ensure that the undertaking is carried out in accordance with the memorandum of agreement.

**(1)** *Signatories.* The signatories have sole authority to execute, amend or terminate the agreement in accordance with this subpart.

**(i)** The agency official and the SHPO/THPO are the signatories to a memorandum of agreement executed pursuant to paragraph (b)(1) of this section.

**(ii)** The agency official, the SHPO/THPO, and the Council are the signatories to a memorandum of agreement executed pursuant to paragraph (b)(2) of this section.

**(iii)** The agency official and the Council are signatories to a memorandum of agreement executed pursuant to § 800.7(a)(2).

(**2**) Invited signatories.

**(i)** The agency official may invite additional parties to be signatories to a memorandum of agreement. Any such party that signs the memorandum of agreement shall have the same rights with regard to seeking amendment or termination of the memorandum of agreement as other signatories.

**(ii)** The agency official may invite an Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties located off tribal lands to be a signatory to a memorandum of agreement concerning such properties.

**(iii)** The agency official should invite any party that assumes a responsibility under a memorandum of agreement to be a signatory.

**(iv)** The refusal of any party invited to become a signatory to a memorandum of agreement pursuant to paragraph (c)(2) of this section does not invalidate the memorandum of agreement.

(**3**) Concurrence by others. The agency official may invite all consulting parties to concur in the memorandum of agreement. The signatories may agree to invite others to concur. The refusal of any party invited to concur in the memorandum of agreement does not invalidate the memorandum of agreement.

(**4**) Reports on implementation. Where the signatories agree it is appropriate, a memorandum of agreement shall include a provision for monitoring and reporting on its implementation.

(**5**) Duration. A memorandum of agreement shall include provisions for termination and for reconsideration of terms if the undertaking has not been implemented within a specified time.

(**6**) Discoveries. Where the signatories agree it is appropriate, a memorandum of agreement shall include provisions to deal with the subsequent discovery or identification of additional historic properties affected by the undertaking.

(**7**) Amendments. The signatories to a memorandum of agreement may amend it. If the Council was not a signatory to the original agreement and the signatories execute an amended agreement, the agency official shall file it with the Council.

(**8**) Termination. If any signatory determines that the terms of a memorandum of agreement cannot be or are not being carried out, the signatories shall consult to seek amendment of the agreement. If the agreement is not amended, any signatory may terminate it. The agency official shall either execute a memorandum of agreement with signatories under paragraph (c)(1) of this section or request the comments of the Council under § 800.7(a).

**(9)** Copies. The agency official shall provide each consulting party with a copy of any memorandum of agreement executed pursuant to this subpart.

## Statutory Authority

Authority Note Applicable to 36 CFR Ch. VIII, Pt. 800

## History

[51 FR 31118, Sept. 2, 1986; 52 FR 25376, July 7, 1987; 64 FR 27044, 27076, May 18, 1999; 65 FR 77698, 77730, Dec. 12, 2000]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

**End of Document**

# 36 CFR 800.16

This document is current through the May 29, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 31947, 91 FR 31932, 91 FR 31898 and 91 FR 31962.

## § 800.16 Definitions.

**(a)** Act means the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470-470w-6.

**(b)** Agency means agency as defined in 5 U.S.C. 551.

**(c)** Approval of the expenditure of funds means any final agency decision authorizing or permitting the expenditure of Federal funds or financial assistance on an undertaking, including any agency decision that may be subject to an administrative appeal.

**(d)** Area of potential effects means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

**(e)** Comment means the findings and recommendations of the Council formally provided in writing to the head of a Federal agency under section 106.

**(f)** Consultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process. The Secretary's "Standards and Guidelines for Federal Agency Preservation Programs pursuant to the National Historic Preservation Act" provide further guidance on consultation.

**(g)** Council means the Advisory Council on Historic Preservation or a Council member or employee designated to act for the Council.

**(h)** Day or days means calendar days.

**(i)** Effect means alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register.

**(j)** Foreclosure means an action taken by an agency official that effectively precludes the Council from providing comments which the agency official can meaningfully consider prior to the approval of the undertaking.

**(k)** Head of the agency means the chief official of the Federal agency responsible for all aspects of the agency's actions. If a State, local, or tribal government has assumed or has been delegated responsibility for section 106 compliance, the head of that unit of government shall be considered the head of the agency.

**(l)**

    **(1)** Historic property means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria.

    **(2)** The term eligible for inclusion in the National Register includes both properties formally determined as such in accordance with regulations of the Secretary of the Interior and all other properties that meet the National Register criteria.

**(m)** Indian tribe means an Indian tribe, band, nation, or other organized group or community, including a native village, regional corporation, or village corporation, as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**(n)** Local government means a city, county, parish, township, municipality, borough, or other general purpose political subdivision of a State.

**(o)** Memorandum of agreement means the document that records the terms and conditions agreed upon to resolve the adverse effects of an undertaking upon historic properties.

**(p)** National Historic Landmark means a historic property that the Secretary of the Interior has designated a National Historic Landmark.

**(q)** National Register means the National Register of Historic Places maintained by the Secretary of the Interior.

**(r)** National Register criteria means the criteria established by the Secretary of the Interior for use in evaluating the eligibility of properties for the National Register (36 CFR part 60).

**(s)**

> **(1)** Native Hawaiian organization means any organization which serves and represents the interests of Native Hawaiians; has as a primary and stated purpose the provision of services to Native Hawaiians; and has demonstrated expertise in aspects of historic preservation that are significant to Native Hawaiians.

> **(2)** Native Hawaiian means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

**(t)** Programmatic agreement means a document that records the terms and conditions agreed upon to resolve the potential adverse effects of a Federal agency program, complex undertaking or other situations in accordance with § 800.14(b).

**(u)** Secretary means the Secretary of the Interior acting through the Director of the National Park Service except where otherwise specified.

**(v)** State Historic Preservation Officer (SHPO) means the official appointed or designated pursuant to section 101(b)(1) of the act to administer the State historic preservation program or a representative designated to act for the State historic preservation officer.

**(w)** Tribal Historic Preservation Officer (THPO) means the tribal official appointed by the tribe's chief governing authority or designated by a tribal ordinance or preservation program who has assumed the responsibilities of the SHPO for purposes of section 106 compliance on tribal lands in accordance with section 101(d)(2) of the act.

**(x)** Tribal lands means all lands within the exterior boundaries of any Indian reservation and all dependent Indian communities.

**(y)** Undertaking means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval.

**(z)** Senior policy official means the senior policy level official designated by the head of the agency pursuant to section 3(e) of Executive Order 13287.

## Statutory Authority

Authority Note Applicable to 36 CFR Ch. VIII, Pt. 800

## History

[64 FR 27044, 27083, May 18, 1999; 65 FR 77698, 77738, Dec. 12, 2000; 69 FR 40544, 40555, July 6, 2004]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2026 All rights reserved.

---

**End of Document**

Bulletin 757–53A0129 RB, this AD requires using the effective date of this AD.

(2) Where Boeing Alert Requirements Bulletin 757–53A0129 RB, dated December 8, 2025, specifies contacting Boeing for repair instructions: This AD requires doing the repair and applicable on-condition actions before further flight using a method approved in accordance with the procedures specified in paragraph (i) of this AD.

**(i) Alternative Methods of Compliance (AMOCs)**

(1) The Manager, AIR–520, Continued Operational Safety Branch, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19. In accordance with 14 CFR 39.19, send your request to your principal inspector or responsible Flight Standards Office, as appropriate. If sending information directly to the manager of the Continued Operational Safety Branch, send it to the attention of the person identified in paragraph (j) of this AD. Information may be emailed to: *AMOC@ faa.gov.* Before using any approved AMOC, notify your appropriate principal inspector, or lacking a principal inspector, the manager of the responsible Flight Standards Office.

(2) An AMOC that provides an acceptable level of safety may be used for any repair, modification, or alteration required by this AD if it is approved by The Boeing Company Organization Designation Authorization (ODA) that has been authorized by the Manager, AIR–520, Continued Operational Safety Branch, FAA, to make those findings. To be approved, the repair method, modification deviation, or alteration deviation must meet the certification basis of the airplane, and the approval must specifically refer to this AD.

**(j) Additional Information**

For more information about this AD, contact Wayne Ha, Aviation Safety Engineer, FAA, 2200 South 216th St., Des Moines, WA 98198; 562–627–5238; email: *wayne.ha@ faa.gov.*

**(k) Material Incorporated by Reference**

(1) The Director of the Federal Register approved the incorporation by reference of the material listed in this paragraph under 5 U.S.C. 552(a) and 1 CFR part 51.

(2) You must use this material as applicable to do the actions required by this AD, unless the AD specifies otherwise.

(i) Boeing Alert Requirements Bulletin 757–53A0129 RB, dated December 8, 2025.

(ii) [Reserved]

(3) For Boeing material identified in this AD, contact Boeing Commercial Airplanes, Attention: Contractual & Data Services (C&DS), 2600 Westminster Blvd., MC 110– SK57, Seal Beach, CA 90740–5600; telephone 562–797–1717; *website myboeingfleet.com.*

(4) You may view this material at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195.

(5) You may view this material at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA,

visit *www.archives.gov/federal-register/cfr/ ibr-locations* or email *fr.inspection@nara.gov.*

Issued on April 27, 2026.

**Brian Knaup,**

*Acting Deputy Director, Integrated Certificate Management Division, Aircraft Certification Service.*

[FR Doc. 2026–08385 Filed 4–29–26; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 73**

**[Docket No. FAA–2025–2635; Airspace Docket No. 25–AWA–5]**

**RIN 2120–AA66**

**Establishment of Prohibited Area P–75; New York, NY**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Notice of proposed rulemaking (NPRM).

---

**SUMMARY:** This action proposes to establish Prohibited Area 75 (P–75) in the vicinity of the New York, NY, residence of the President of the United States. The United States Secret Service (USSS) requested FAA restrict aircraft operations in the vicinity of President Trump's New York residence. To provide adequate safeguards for the USSS to fully secure the non-Governmental property and protect USSS protectees in the interest of national security, FAA is proposing to establish a prohibited area in the immediate vicinity of the presidential residence.

**DATES:** Comments must be received on or before June 15, 2026.

**ADDRESSES:** Send comments identified by FAA Docket No. FAA–2025–2635 and Airspace Docket No. 25–AWA–5 using any of the following methods:

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* and follow the online instructions for sending your comments electronically.

• *Mail:* Send comments to Docket Operations; U.S. Department of Transportation (DOT), 1200 New Jersey Avenue SE, Room W58–213, West Building 5th Floor, Washington, DC 20590–0001.

• *Hand Delivery or Courier:* Take comments to Docket Operations in Room W58–213 of the West Building 5th Floor at 1200 New Jersey Avenue SE, Washington, DC 20590 between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

• *Fax:* Fax comments to Docket Operations at (202) 493–2251.

*Docket:* Background documents or comments received may be read at *www.regulations.gov* at any time. Follow the online instructions for accessing the docket or go to the Docket Operations in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Brian Vidis, Rules and Regulations Group, Policy Directorate, Federal Aviation Administration, 600 Independence Avenue SW, Washington, DC 20597; telephone: (202) 267–8783.

**SUPPLEMENTARY INFORMATION:**

**I. Executive Summary**

FAA proposes to add a regulation to Title 14 of the Code of Federal Regulations (14 CFR) part 73, subpart C to establish a prohibited area in the vicinity of Trump Tower in New York, New York. The prohibited area is necessary according to the United States Secret Service (USSS) to protect the President, secure the non-Governmental property in accordance with the Presidential Protection Assistance Act of 1976, and exercise its authority under 18 U.S.C. 3056(a).[1]

Proposed § 73.95 would create Prohibited Area P–75 (P–75). P–75 would prohibit aircraft operations from the surface to 1,000 feet above ground level (AGL) beginning at lat. 40°45′52″ N, long. 073°57′ 11″ W; then counterclockwise along an arc with a 1 nautical mile (NM) radius centered at lat. 40°45″ 46″ N, long. 073°58′30″ W; to lat. 40°44″48″ N, long. 73°58″ 09″ W, with a straight line to the point of beginning. In other words, P–75 would cover a circle with a 1 NM radius centered on Trump Tower and with a flat edge on the southeast side that parallels the East River. Aircraft operations would not be permitted within P–75 unless the using agency, which would be USSS, granted authorization to enter the area.[2]

**II. Authority for This Rulemaking**

FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator.

---

[1] Public Law 94–524 (Oct. 17, 1976) enabling the President to designate one non-governmental property to be fully secured by the USSS on a permanent basis.

[2] 14 CFR 73.83 states that ''No person may operate an aircraft within a prohibited area unless authorization has been granted by the using agency.''

Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft, the efficient use of airspace, and protecting individuals and property on the ground. In addition, 49 U.S.C. 44701(a)(5) charges FAA with promoting safe flight of civil aircraft by prescribing regulations and minimum standards for cybersecurity and other practices, methods, and procedures FAA finds necessary for safety in air commerce and national security. This regulation is within the scope of that authority as it would establish prohibited area airspace in the vicinity of New York, NY, to protect persons and property on the ground and to enhance national security.

### III. Background and Proposed Rule

FAA has prohibited the operation of aircraft in the vicinity of seven presidential and vice presidential residences in the interest of national security by establishing a prohibited area pursuant to 14 CFR part 73. Prohibited areas are designated when necessary to prohibit all flight within an area, except in very limited circumstances, in the interest of national security. No person may conduct operations within a prohibited area without the permission of the using agency.[3] FAA has established prohibited areas in the vicinity of the following former presidential and vice presidential residences:

• On February 18, 1969, FAA established P–29 in the vicinity of Key Biscayne, Florida.[4] USSS had requested FAA establish the prohibited area for the security of the President, who had a residence in Key Biscayne. One concern was that public interest in the President may attract numerous aircraft over the residence for sightseeing and photographic purposes. The prohibited area provided for the protection of the President and property on the ground. FAA prohibited operations within 1 nautical mile (NM) radius from the surface up to 18,000 feet above mean sea level (MSL). FAA was the using agency. FAA revoked the prohibited area on September 3, 1974, shortly after President Nixon left office because the

conditions that had prompted the prohibited area no longer existed.[5]

• On June 23, 1969, FAA established P–25 in the vicinity of San Mateo, California to provide adequate safeguards for the protection of the President and persons or property on the ground.[6] The prohibited area was established for the security of the President and because the public interest in the President might attract numerous aircraft over the Presidential residence for sightseeing and photographic purposes. FAA prohibited operations within a 1 NM radius from the surface to 4,000 feet MSL. FAA was the using agency. FAA revoked the prohibited area on September 3, 1974, shortly after President Nixon left office because the conditions that had prompted the prohibited area no longer existed.[7]

• On February 18, 1977, FAA established P–77 in the vicinity of Plains, Georgia.[8] The prohibited area was established due to the interest the President's residence may attract for sightseeing and photographic purposes. To provide adequate safeguards for the President and persons or property on the ground, FAA prohibited operations within 1 NM radius from the surface up to 1,500 feet MSL. FAA was the using agency. FAA revoked the prohibited area effective May 5, 1988, after President Carter left office, as USSS had notified the FAA that national welfare and security no longer required the prohibited area.[9]

• On January 20, 1981, FAA established P–65 in the vicinity of Pacific Palisades, California, and P–66 in the vicinity of Rancho del Cielo, California, based on USSS's request.[10] FAA prohibited operations within 1 NM radius from the surface to 1,000 feet above ground level (AGL) in both areas. The purpose of the prohibited areas was to enhance the level of security for the President by prohibiting unauthorized flights of aircraft over and in the immediate vicinity of presidential residences. The vertical and lateral limits of the areas were designed to impose the minimum burden upon the public while still providing acceptable security restraints. FAA was the using agency. On July 27, 1981, FAA revoked P–65 because USSS determined a prohibited area was no longer required.[11] Effective October 23, 1986,

P–66 was expanded laterally and vertically due to the USSS's determination that this expansion was necessary to enhance the level of security provided to the President.[12] The area was subdivided into P–66A and P–66B as follows: P–66A from the surface to 4,000 feet MSL and P–66B from 4,000 feet MSL up to but not including 5,000 feet MSL. P–66B was activated by notice to airmen (NOTAM). FAA revoked the prohibited areas on June 1, 1989, shortly after President Reagan left office.[13] The FAA's revocation was based on the USSS's indication that the prohibition was no longer required for national welfare or security purposes.[14]

• On November 26, 1981, FAA established P–67 in the vicinity of Kennebunkport, Maine. FAA prohibited operations within 1 NM radius from the surface to 1,000 feet MSL.[15] The establishment of P–67 was based on USSS's request to prohibit the unauthorized flight of aircraft in the immediate vicinity of the Vice President's residence. The using agency was FAA. P–67 is still in effect at the time of the publication of this proposed rule.

• On May 17, 2001, FAA established P–49 in the vicinity of Crawford, Texas, in response to a USSS request.[16] The purpose of the prohibited area was to enhance the level of security provided to the President, who had a residence in that area. FAA prohibited operations within a 3 NM radius from the surface up to 5,000 feet MSL. USSS was the using agency. Effective February 16, 2010, FAA reduced the boundary and altitude dimensions of the prohibited area from a 3 NM radius to a 2 NM radius and from 5,000 feet MSL to 2,000 feet MSL.[17] The USSS determined that the larger restriction was no longer necessary.

On September 16, 2025, USSS requested that FAA establish a "permanent flight restriction under 14 CFR 99.7 to ensure the safety and security of our protectee" in the vicinity of the Trump Tower "due to adverse threat intelligence and the ongoing protective mission of the USSS."[18] Moreover, USSS stated it would "greatly increase the ability to mitigate the

---

[3] Under § 73.85 the using agency is the agency, organization, or military command that established the requirements for the prohibited area.

[4] 34 FR 2306 (Feb. 18, 1969).

[5] 39 FR 32325 (Sep. 6, 1974).

[6] 34 FR 9854 (Jun. 26, 1969).

[7] 39 FR 32325 (Sep. 6, 1974).

[8] 42 FR 142 FR 11826 (Mar. 1, 1977); 42 FR 12168 (Mar. 3, 1977).

[9] 53 FR 3010 (Feb. 3, 1988).

[10] 46 FR 3499 (Jan. 15, 1981).

[11] 46 FR 38345 (Jul. 27, 1981).

[12] 51 FR 30208 (Aug. 25, 1986).

[13] 54 FR 13517 (Apr. 4, 1989).

[14] Id.

[15] 46 FR 47065 (Sep. 24, 1981).

[16] 66 FR 16391 (Mar. 26, 2001).

[17] 75 FR 15992 (Mar. 31, 2010).

[18] September 16, 2025 Letter from Sean M. Curran, Director, United States Secret Service, to Bryan Bedford, Administrator, FAA. A copy of this letter has been placed in the docket for this rulemaking.

persistent risk posed by unauthorized aircraft and unmanned aircraft systems (UAS) operating in the proximity.'' USSS also requested that the restriction be published in the **Federal Register** and charted to ensure compliance. This action responds to that request.

On October 20, 2025, FAA issued a Special Security Instruction (SSI) flight restriction, under 14 CFR 99.7, that temporarily restricts all flight operations in the vicinity of the presidential residence at New York, NY.[19] The SSI flight restriction is set to expire on October 20, 2026. The SSI extends from the surface to 1,000 feet AGL. The SSI covers an area beginning at 40°45′53″ N, long. 073°57′11″ W, then counterclockwise along a 1 nautical mile (NM) arc centered at lat. 40°45′46″ N, long. 073°58′30″ W; to lat. 40°44′48″ N, long. 073°58′09″ W; to the point of beginning. Under the § 99.7 SSI flight restriction, aircraft cannot enter the airspace unless (1) they have authorization from ATC and or are on an air traffic control (ATC) instrument flight rules (IFR) plan with a discrete code assigned by ATC, (2) are squawking the discrete code prior to departure and at all times while in the TFR, and (3) in two-way radio communication with ATC.

Under 49 U.S.C. 40103(b) and in compliance with the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.,* FAA can designate airspace through a rulemaking. In addition, FAA charts permanent flight restrictions established through rulemaking providing enhanced public awareness; whereas, temporary SSI flight restrictions are not charted. The enhanced public awareness in turn provides a higher level of security. This proposed rule would make the area covered by the SSI flight restriction a permanent prohibited area that is in effect continuously. Under 14 CFR 73.83, no person may operate an aircraft within a prohibited area without permission from the using agency. Although the prohibited area is more restrictive than the § 99.7 SSI in wording, there are few, if any, practical differences.

FAA is proposing an amendment to 14 CFR part 73 to establish Prohibited Area P–75, New York, NY. This rule would apply to all persons seeking to operate in the area defined in 14 CFR 73.95. The breadth of applicability is necessary in the interest of national security and to ensure the USSS ability to secure the non-Governmental property. The prohibited area would

extend from the surface to 1,000 feet AGL, and would be defined as an area beginning at lat. 40°45′52″ N, long. 073°57′11″ W; then counterclockwise along an arc with a 1 nautical mile (NM) radius centered at lat. 40°45′46″ N, long. 073°58′30″ W; to lat. 40°44′48″ N, long. 73°58′09″ W; with a straight line to the point of beginning.[20] In other words, P–75 would cover a circle with a 1 NM radius centered on Trump Tower and with a flat edge on the southeast side that parallels the East River.[21] Flight within this area would be prohibited unless permission is obtained from the using agency, which would be USSS.

The size of the proposed prohibited area is based on discussions between FAA and USSS and meets security needs while minimizing impact on operators and the general public. Specifically, in its coordination with USSS, FAA sought to ensure minimal impact on helicopter operations and other operations that are routinely conducted along the Hudson and East River corridors. FAA specifically carved out an area over the East River that is within a 1 NM mile of Trump Tower to allow helicopter operations along the East River to continue. The SSI flight restriction and proposed prohibited area achieve the objective of maintaining the efficient flow of air traffic while also meeting the security requirements associated with USSS's request. FAA constructed the SSI flight restriction and proposed prohibited area in a way that avoids typical aircraft routes. Only law enforcement helicopters, air ambulance aircraft, and unmanned aircraft systems operated in this area before the SSI flight restrictions became effective on October 20, 2025. Additionally, per 14 CFR 73.83, if authorization has been granted by the using agency, which is USSS in this case, aircraft could still gain access to the area.

### Regulatory Notices and Analyses

*Regulatory Flexibility Act*

FAA has determined that this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore: (1) is not a ''significant regulatory action'' under Executive Order 12866; (2) is not a ''significant rule'' under DOT Order 2100.6B,

''Rulemaking and Guidance Procedure'' (March 10, 2025); and (3) is anticipated to have a minimal economic impact, as it only affects air traffic procedures and air navigation, resulting in at most de minimis costs from minor rerouting of flights. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this proposed rule, when promulgated, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

*International Trade Impact Assessment*

The Trade Agreements Act of 1979 (Pub. L. 96–39), as amended by the Uruguay Round Agreements Act (Pub. L. 103–465), prohibits Federal agencies from establishing standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. Pursuant to these Acts, the establishment of standards is not considered an unnecessary obstacle to the foreign commerce of the United States, so long as the standard has a legitimate domestic objective, such as the protection of safety, and does not operate in a manner that excludes imports that meet this objective. The statute also requires consideration of international standards and, where appropriate, they be the basis for U.S. standards.

FAA has assessed the potential effect of this proposed rule and determined that it has legitimate domestic objectives of safety and security. The proposed rule would not impact exports. As a result, FAA does not consider this proposed rule as creating an unnecessary obstacle to foreign commerce.

*International Compatibility*

In keeping with U.S. obligations under the Convention on International Civil Aviation, it is FAA policy to conform to International Civil Aviation Organization(ICAO) Standards and Recommended Practices to the maximum extent practicable. FAA has determined there are no ICAO Standards and Recommended Practices that correspond to these proposed regulations.

*Paperwork Reduction Act*

The Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)) requires FAA to consider the impact of paperwork and other information collection burdens imposed on the public. According to the 1995 amendments to the Paperwork Reduction Act (5 CFR 1320.8(b)(2)(vi)), an agency may not collect or sponsor

---

[19] A copy of the SSI has been placed in the docket.

[20] The beginning point of the proposed prohibited area is one second in latitude different from the SSI beginning point to account for a rounding error, but the proposed prohibited area and SSI cover essentially the same space.

[21] A geographical depiction has been placed in the docket.

the collection of information, nor may it impose an information collection requirement unless it displays a currently valid Office of Management and Budget (OMB) control number. FAA determined that there would be no information collection associated with the proposed rule.

*Environmental Review*

This proposal will be subject to an environmental analysis in accordance with FAA Order 1050.1G, ''FAA National Environmental Policy Act Implementing Procedures'' prior to any FAA final regulatory action.

## Executive Order Determinations

*Executive Order 13132, Federalism*

FAA has analyzed this proposed rule under the principles and criteria of Executive Order 13132, Federalism. FAA has determined this action would not have a substantial direct effect on the States, or the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government, and, therefore, would not have federalism implications.

*Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

Consistent with Executive Order 13175, Consultation and Coordination with Indian Tribal Governments and FAA Order 1210.20, American Indian and Alaska Native Tribal Consultation Policy and Procedures, FAA ensures Federally Recognized Tribes (Tribes) are given the opportunity to provide meaningful and timely input regarding proposed Federal actions that have the potential to affect uniquely or significantly their respective Tribes. At this point, FAA has not identified any unique or significant effects, environmental or otherwise, on Tribes resulting from this proposed rule.

*Executive Order 13211, Regulations That Significantly Affect Energy Supply, Distribution, or Use*

FAA analyzed this proposed rule under Executive Order 13211, Actions Concerning Regulations that Significantly Affect Energy Supply, Distribution, or Use (May 18, 2001). FAA has determined it would not be a ''significant energy action'' under the E.O. and would not be likely to have a significant adverse effect on the supply, distribution, or use of energy.

*Executive Order 13609, Promoting International Regulatory Cooperation*

Executive Order 13609, Promoting International Regulatory Cooperation, promotes international regulatory cooperation to (1) meet shared challenges involving health, safety, labor, security, environmental, and other issues and to reduce, eliminate, or (2) prevent unnecessary differences in regulatory requirements. FAA has analyzed this action under the policies and agency responsibilities of Executive Order 13609 and has determined this action would have no effect on international regulatory cooperation.

*Executive Order 14192, Unleashing Prosperity Through Deregulation*

This proposed rule is not an Executive Order 14192 regulatory action because it is being issued with respect to a national security or homeland security function of the United States.

## Comments Invited

The FAA invites interested persons to participate in this rulemaking by submitting written comments, data, or views. Comments are specifically invited on the overall regulatory, aeronautical, economic, environmental, and energy-related aspects of the proposal. The most helpful comments reference a specific portion of the proposal, explain the reason for any recommended change, and include supporting data. To ensure the docket does not contain duplicate comments, commenters should submit only one time if comments are filed electronically, or commenters should send only one copy of written comments if comments are filed in writing.

The FAA will file in the docket all comments it receives, as well as a report summarizing each substantive public contact with FAA personnel concerning this proposed rulemaking. Before acting on this proposal, the FAA will consider all comments it receives on or before the closing date for comments. The FAA will consider comments filed after the comment period has closed if it is possible to do so without incurring expense or delay. The FAA may change this proposal in light of the comments it receives.

*Privacy:* In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *www.dot.gov/privacy.*

## List of Subjects in 14 CFR Part 73

Airspace, Prohibited areas, Restricted areas.

## The Proposed Amendment

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 73 as follows:

## PART 73—SPECIAL USE AIRSPACE

■ 1. The authority citation for part 73 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

## § 73.95 P–75 New York, NY [New]

■ 2. Section 73.95 is amended by adding the following:

\* \* \* \* \*

## P–75 New York, NY [New]

*Boundaries.* Beginning at lat. 40°45′52″ N, long. 073°57′11″ W; then counterclockwise along a 1 NM arc centered at lat. 40°45′46″ N, long. 073°58′30″ W; to lat. 40°44′48″ N, long. 073°58′09″ W; to the point of beginning.

*Designated altitudes.* Surface to 1,000 feet AGL.

*Time of designation.* Continuous.

*Using agency.* United States Secret Service, Washington, DC.

\* \* \* \* \*

Issued in Washington, DC, on April 28, 2026.

**Alex W. Nelson,**

*Manager, Rules and Regulations Group.*

[FR Doc. 2026–08430 Filed 4–29–26; 8:45 am]

**BILLING CODE 4910–13–P**

---

## INTERNATIONAL TRADE COMMISSION

## 19 CFR Part 210

## Section 337 Adjudication and Enforcement

**AGENCY:** International Trade Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The United States International Trade Commission (''Commission'') proposes to amend its Rules of Practice and Procedure concerning section 337 adjudication and enforcement. The intended effect of the proposed amendments is to require disclosure of information by the parties and intervenors in section 337 investigations and ancillary proceedings before the Commission regarding entities that have an ownership or a financial interest in the investigation.

**DATES:** To be assured of consideration, written comments must be received by 5:15 p.m. on June 29, 2026.

**ADDRESSES:** Lisa R. Barton, Secretary to the Commission, U.S. International